Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GERALD S., and V.S., <br><br> Plaintiffs, <br><br> vs. <br><br> MODA HEALTH, <br><br> Defendant. | COMPLAINT |

Plaintiffs Gerald S. ("Gerald") and V.S., through their undersigned counsel, complain and

allege against Defendant Moda Health as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Gerald and V.S. are natural persons residing in Multnomah County, Oregon. Gerald is

   V.S.'s father.

2. Moda was the insurer and claims administrator, as well as a fiduciary under ERISA for a

   fully insured health benefits plan ("the Plan"), providing coverage for the Plaintiffs

   through Gerald's employer during the timeframe for V.S.'s treatment from August 21,

1

2020, until December 31, 2020. After that date, coverage was provided through another health insurer.

3. V.S. received medical care and treatment at Evoke at Entrada ("Evoke") from August 21, 2020, to November 11, 2020, and Solacium Sunrise ("Sunrise") from November 11, 2020, to May 22, 2021,

4. Evoke and Sunrise are programs located in Utah, which provide sub-acute inpatient care to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Moda denied claims for payment of V.S.'s medical expenses in connection with her treatment at Evoke and Sunrise.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Moda does business in Utah, and the treatment at issue took place in Utah.

8. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plans, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's

violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### V.S.'s Developmental History and Medical Background

10. From a very early age V.S. struggled with transitions, was hypersensitive to sensory stimulation, and often threw long lasting tantrums. V.S. would lash out at her younger sister and would even bite her at times.

11. On one occasion, V.S. intentionally urinated on her sister's bed. V.S. appeared to be resentful that her younger sister was better able to control her emotions and regulate herself than V.S. was.

12. V.S. was often fidgety and had an inability to stay focused. She continued to throw tantrums as she grew older which became severe enough that her long-time babysitter quit. V.S. began receiving weekly therapy.

13. V.S. was diagnosed with an optical tracking disorder, V.S.'s doctors said that this condition caused many children to exhibit ADHD like symptoms, and receiving treatment could help her behaviorally. V.S.'s treatment for this was successful and she was able to become calmer and more focused. She also had fewer outbursts for a time.

14. V.S. generally had few problems making and keeping friends, but she started to be bullied by others and became very anxious whenever it was time to go to school. V.S.'s academic performance started to decline and she was found to be self-harming by cutting.

15. V.S. started seeing a new therapist but continued to struggle. While walking in the hallway at school, V.S. was slammed into a locker by a male student. A teacher saw this,

and the boy lost his spot on the football team. The boy then threatened V.S. and her friends to the point that her boyfriend broke up with her.

16. V.S. continued to act out, she would constantly yell and fight with her family, was failing all her classes, and wasn't responsive to any consequences for her behaviors. V.S. started having panic attacks and was given medication, but this seemed to exacerbate her symptoms.

17. V.S. started using drugs and alcohol. The intensive outpatient program she was attending diagnosed her with generalized anxiety disorder, major depressive disorder, and borderline personality disorder with cluster B traits. V.S. lied to others almost habitually and during one doctor's visit, she alleged that she lived in an unsafe environment.

18. V.S. frequently fought with her sister and sometimes left bruises on her arms. V.S. was found to be stealing from her family and had shopping bags full of clothes with their tags still on them stashed in her bedroom. When confronted about this, V.S. stated that her friends had been buying them for her.

19. V.S. was accepted into a new school, and while she was initially very excited about this, she stopped attending after only about a week. Shortly after this, Gerald had a visit from a DCFS worker who stated that there had been an anonymous report that V.S. had no food, was being abused, and that her father was an alcoholic. The claims were found to be unsubstantiated.

20. V.S. would often leave home without permission and then return either very late at night or early the next day, often coming home around four in the morning. In June of 2020, V.S.'s therapist suggested that she begin attending a wilderness or residential treatment program.

21. V.S. was then taken to a wilderness program called Evoke by a crisis transportation team.

22. While at Evoke, V.S. was additionally diagnosed with ADHD. V.S. made significant progress while in treatment at Evoke, but her treatment team expressed concern that she would relapse if discharged home at that point and recommended that V.S. receive additional residential care.

**The Denial and Appeal Process With Moda for Evoke**

23. Moda informed Gerald on his online member portal that it had denied payment for V.S.'s treatment at Evoke under remark code 21M: "This service requires a referral or an authorization."

24. On January 17, 2022, V.S.'s mother, ("Andrea"), submitted a level one appeal of the denial of payment for V.S.'s treatment. She wrote that the Plan provided for a retrospective review as well as a second opinion "to confirm that non-emergency treatment is medically necessary." Andrea requested that both be performed.

25. In a letter dated February 22, 2022, Moda upheld the denial of payment for V.S.'s treatment at Evoke. Moda stated that the claims were denied correctly as prior authorization was not obtained and prior authorization was a prerequisite for out-of-network residential chemical dependency treatment. Moda further stated that a retrospective review was not allowed as the claims were not preauthorized.

26. On April 18, 2022, Andrea submitted a level two appeal of the denial of payment for V.S.'s treatment. Andrea wrote that while Moda claimed residential chemical dependency programs required prior authorization, Evoke was not actually a residential program but was instead an outdoor behavioral health program, was licensed by the State

of Utah as such, and operated in accordance with Utah state regulations for outdoor youth programs.

27. Andrea stated that V.S.'s claims were originally submitted using the 1006 revenue code which was exclusively for outdoor behavioral health programs, but despite this code being in use for more than five years, Moda refused to process the claims, forcing her to resubmit the claims under a different, less appropriate, revenue code.

28. Andrea pointed out that Moda claimed that a full list of services requiring preauthorization was available on its website and noted that outdoor behavioral health programs were conspicuously absent from that list.

29. She wrote that Moda had an obligation to comply with MHPAEA and argued that because it did not list outdoor behavioral health programs as an excluded service and also refused to recognize the properly submitted 1006 revenue code for outdoor behavioral healthcare, she was concerned that Moda was imposing limitations based on facility type or provider specialty in violation of MHPAEA.

30. In addition Andrea asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

31. In a letter dated May 18, 2022, Moda upheld the denial of payment for V.S.'s treatment. The reviewer wrote that residential treatment programs required prior authorization for approval. They stated that this was not intended to restrict the availability of care but was done to ensure member safety, promote proper use of services, and to support cost effective treatment options for members. The reviewer stated that members were responsible for obtaining authorization for out-of-network services.

32. The reviewer wrote that Evoke met the definition of a residential chemical dependency treatment program and the claims were processed correctly as prior authorization was required but not obtained.

33. The reviewer stated that Moda was compliant with MHPAEA as the "plan language regarding prior authorization makes no distinction between behavioral health and medical/surgical services."

**Sunrise**

34. In a letter dated November 12, 2020, Moda denied payment for V.S.'s treatment at Sunrise. Moda stated that it had reached out to Sunrise to request documentation to verify whether its program requirements were met, but as it had not yet received this documentation from Sunrise, it was denying payment.

35. In another letter which was also dated November 12, 2020, Moda stated that it had performed "a careful review of the documentation provided by Sunrise Residential Treatment Center" and that it had determined the treatment was not medically necessary. The letter then listed several program requirements, such as a danger to self or others, and a minimum of eight hours of treatment per day, without specifying which, if any of these,

were allegedly not met. The letter then stated that it conducted "an interview with your

parents" but was unable to determine from this if its admission criteria had been met.

36. On August 2, 2021, Andrea submitted an appeal of Moda's denial of V.S.'s residential

    treatment at Sunrise. She emphasized the importance of Moda's compliance with ERISA

    during the review process and asked it to carefully examine the information she provided.

37. She asked Moda to produce the specific clinical criteria it used to evaluate V.S.'s

    treatment, as well as any case notes, reports, or other documentation relevant to the

    denials.

38. Andrea wrote that according to its website, Moda relied on the MCG criteria for inpatient

    hospitalization to evaluate the medical necessity of residential treatment. She contended

    that V.S.'s treatment at Sunrise should have been approved as it satisfied the definition

    for residential treatment care in the terms of the Plan, namely:

    > Residential Program means a state-licensed program or facility providing an
    > organized full-day or part-day program of treatment. Residential programs
    > provide overnight 24-hour per day care and include programs for treatment of
    > mental health conditions or chemical dependency. Residential program does not
    > include any program that provides less than 4 hours per day of direct treatment
    > services.

39. Andrea wrote that Sunrise clearly met the definition of a residential program, as well as a

    "provider" as defined by the insurance plan booklet. She stated that not only was Sunrise

    duly licensed by the State of Utah to provide residential care, but it was also fully

    accredited by The Joint Commission, "which further demonstrates their ongoing

    commitment to excellence in healthcare." She noted that the accreditation standards for

    Joint Commission accreditation "are extremely high."

40. She contended that by imposing requirements such as programming for eight hours a day,

    five days a week, individual therapy twice weekly, a physician evaluation within seventy-

two hours, and weekly physician visits, Moda was imposing restrictions in violation of MHPAEA based on facility type or other criteria.

41. She pointed out that Moda had not disclosed that it required these in the actual terms of the Plan but had listed them as factors for denying care in its denial correspondence. She included a table showing that Moda did not apply these restrictions to analogous medical or surgical services and stated that Moda was imposing treatment limitations on mental health services based on facility type that were more rigorous than the treatment limitations Moda imposed for analogous levels of medical and surgical care.

42. She asked Moda to perform a MHPAEA compliance analysis to evaluate its level of compliance with the statute, and again asked for copies of the Plan Documents.

43. In a letter dated August 26, 2021, Moda upheld the denial of payment for S.V.'s treatment. The letter stated that:

> Upon review of the submitted documentation, it was found that you made good progress in your communication and coping skills during your stay at the wilderness therapy program. You did not have a psychiatric or medical condition that required 24- hour specialized care with physician oversight based on the clinical documentation provided and reviewed. You were not agitated or threatening toward yourself or others. You could have been safely and effectively treated at a lower level of care. Therefore, it has been determined psychiatric residential treatment during November 11, 2020 through December 30, 2020 was not medically necessary.

> Additionally, in reviewing a copy of the weekly schedule of activities at the Sunrise program it was determined that the facility does not meet the residential treatment program requirements including 8h/day, 5d/week of structured mental health treatment; weekly psychiatric physician oversight, twice per week individual therapy, and once weekly family therapy.

> Also in the appeal, [Andrea] expressed concerns that the basis for the intensity of service requirement was not clear to you and noted that MCG criteria do not include such a requirement. [Andrea] wrote that Moda "failed to provide a copy of the specific clinical guideline or medical necessity criteria used to deny [V.S.]'s treatment."

> When we issue a denial, we are required to cite the specific reason(s) for the denial and advise you that you may request a copy of the criteria upon which the denial is based. We met both of those requirements by citing the specific reasons for the denial (pages 1-3 of the denial letter dated 11/12/20) and by including this statement on page 4:
>
> You may request a copy of all the documents we used to make our denial decision, free of charge. This includes the benefit provision and/or medical criteria we used to make the decision, as well as diagnosis and billing codes. For this information, contact us as at the address or telephone number below.[1]

44. The letter then stated that the statement on Moda's website that the MCG criteria were used for residential services was an error. The reviewer stated that Moda used internally developed criteria which included the requirement of eight hours per day of structured treatment.

45. The reviewer stated that Moda diligently complied with MHPAEA and that while Moda did apply non-quantitative treatment limitations ("NQTL") on V.S.'s mental healthcare, the same processes and strategies were used to develop NQTLs for residential treatment as were used to develop NQTLs for medical or surgical services. In addition, both mental health services and medical/surgical services had extra requirements which were not listed in the handbook, so the reviewer alleged that no violation took place.

46. The reviewer does not appear to have addressed the specific MHPAEA violations Andrea raised, but instead opined that because Moda applied NQTLs to residential treatment and other NQTLs medical or surgical care, no violation took place.

47. On October 21, 2021, Gerald and Andrea submitted a level two appeal of the denial of payment for V.S.'s treatment at Sunrise. They argued that V.S.'s medical records directly

---

[1] Plaintiffs did request a copy of these documents in their appeal. However, they did not receive them.

contradicted Moda's assertions that V.S. was making sufficient progress and did not

require 24-hour specialized care.

48. They included updated copies of V.S.'s medical records which continued to show issues

such as a desire to self-harm, angry outbursts, depressed and irritable moods, food

restrictions, urges to resume substance use, and feelings of worthlessness. They argued

that any lower level of care would not only have been insufficient, but would have been

actively unsafe for treating V.S. They again asked for a copy of the Plan Documents.

49. In a letter dated December 20, 2021, Moda upheld the denial of payment for V.S.'s

treatment. The letter stated in pertinent part:

> The following admission criteria were not met:
>
> - The patient cannot be treated safely and effectively at a lower level of care
>   due to 1 or more of the following:
>   - Serious and persistent psychosocial impairments that have failed to
>     respond to treatment at all appropriate lower levels of care, or
>     documentation of why such treatments are reasonably expected to
>     be insufficient to meet the member's needs. (Note: Non-
>     participation does not constitute failure at a lower level of care).
>   - Danger to self or others.
>   - Profound role failure; or
>   - The appropriate lower level of care is not reasonably available to
>     the patient.
> - Discharge planning, including coordination with established outpatient
>   providers, begins at time of admission.
>
> Additionally, based on the Medical Consultant's review of the submitted
> documentation, it was not clearly established that the policy criteria for residential
> treatment is met. Per the notes, the programming appeared to be predominantly
> educational in nature and the treatment structure required by the policy was not
> demonstrated. The Medical Consultant also states that per the clinical notes, it
> also does not appear that you were monitored by a psychiatrist at the required
> frequency (for inpatient/residential care), suggesting that your treatment could
> been provided at a less medically intensive level of care.

50. On June 8, 2022, Gerald and Andrea asked for the denial of payment to be evaluated by

an external review agency. They argued that V.S.'s treatment remained medically

necessary and asked that the reviewer carefully evaluate all the information they provided. They expressed concern that Moda's denial letter did not refer to V.S.'s medical records or any of the other clinical evidence they had submitted.

51. They emphasized that not only was Sunrise licensed, but it was also accredited by The Joint Commission. They reiterated that these standards were extremely rigorous and Moda's assertion that the treatment was "predominantly educational" in nature suggested that Moda had not carried out a full, fair, and thorough review.

52. They took issue with Moda's criteria and argued that these criteria deviated significantly from generally accepted standards of medical practice. In addition, they alleged that Moda had misapplied these same criteria. They contended that contrary to Moda's assessment, V.S. exhibited behaviors such as self-harm urges, disordered eating, and physical aggression towards others which demonstrated she remained at high risk and it was not yet safe for her to return home.

53. In addition, they wrote that V.S.'s discharge goals were updated frequently during her time there, that Sunrise was intended to be a long-term treatment intervention, and it was counter to V.S.'s best interests to plan for her discharge from Sunrise before any steps had been taken to resolve her issues.

54. They pointed out that V.S. was sent to Sunrise based on the strong recommendations of her treatment team. They included letters of medical necessity with the appeal attesting to V.S.'s need for treatment and the risks of relapse and regression if she did not receive it.

55. They argued that V.S.'s treatment met all the requirements contained in Moda's proprietary criteria and Moda had presented no clinical evidence to indicate otherwise.

They argued that Moda had repeatedly stood in the way of V.S. receiving effective

treatment and again requested to be provided with a copy of the Plan Documents.

56. In a letter dated July 12, 2022, the external review agency upheld the denial of payment

for V.S.'s treatment. The reviewer gave the following comments concerning their

decision:

> This member was admitted to Solacium Sunrise Residential Treatment on 11/11/2020 following a discharge from Evoke at Entrada Wilderness Program where she had completed the wilderness treatment services from 8/21/2020 to 11/11/2020. The member has a history of multiple substance use disorders, as well as a personal history of psychological trauma, social anxiety disorder, unspecified depressive disorder, and attention deficit hyperactivity disorder. Upon completion of the wilderness program, the discharging provider in conjunction with the requests of the member's parents recommended the member continue in residential treatment.
>
> Documentation available does not provide evidence that would support the medical necessity for admission to treatment at Solacium Sunrise from 11/11/2020 through 12/31/2020. At admission, the member did not present an imminent risk of harm to self or others. In the safety screening, the member admitted past thoughts of suicidal ideation; however, evidenced no current suicidal ideation or history of suicide attempts. The member additionally admitted to prior self-harm gestures in the form of cutting with scissors or knives; however, identified no self-harm over six months prior, as well as evidencing no current thought of harm to self or others. Furthermore, the member had used no substances since admission to the wilderness program on 8/21/2020. There is no indication of imminent risk.
>
> Records provide demonstrated a single psychiatric evaluation on 11/16/2020. There is no indication of ongoing psychiatric management. Progress notes reflect 2 hours of treatment services in the evening per day. While the member evidenced some struggles and issues with boundary, impulsivity, and continued ongoing work at effective emotion management, the described symptoms did not establish that residential treatment was required.
>
> Despite the appeal by the member's family that residential treatment was medically required due to the member remaining at high risk of harm to self or others, verbally aggressive, and having treatment resistance suggesting a lower level of care would not have been effective, these assertions are not supported by the medical records and documentation contained therein. Therefore, residential treatment at Solacium Sunrise from 11/11/2020 through 12/31/2020 was not medically necessary.

57. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

58. The denial of benefits for V.S.'s treatment was a breach of contract and caused Gerald to incur medical expenses that should have been paid by the Plan in an amount totaling over $100,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

59. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Moda, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

60. Moda and the Plan failed to provide coverage for V.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

61. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

62. The denial letters produced by Moda do little to elucidate whether it conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided Plaintiffs with the "full and fair review" to which they are entitled.

63. Defendant failed to substantively respond to the issues presented in Gerald and Andrea's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs

raised during the appeals process.

64. For instance, Moda relied on factors to deny payment which were not listed in the Plaintiffs' benefit booklet. Moda then directed Plaintiffs to a website stating that it used MCG criteria for acute hospitalization care to evaluate residential treatment, but later in the appeals process stated that this was an error, and it relied instead on its own proprietary criteria.

65. Moda and the agents of the Plans breached their fiduciary duties to V.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in V.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of V.S.'s claims.

66. The actions of Moda and the Plan in failing to provide coverage for V.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

67. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

68. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Moda's fiduciary duties.

69. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

70. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

71. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

72. The medical necessity criteria used by Moda for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria Moda applies to analogous intermediate levels of medical or surgical benefits.

73. Comparable benefits offered by Moda for medical/surgical treatment analogous to the benefits Moda excluded for V.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

74. When Moda receives claims for intermediate level treatment of medical and surgical conditions, it provides benefits and pays the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

75. Moda evaluated V.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because Moda denied coverage for mental health benefits when it would have paid for claims for analogous levels of medical or surgical benefits.

76. For instance, Moda denied payment based on factors such as a lack of programming for eight hours a day, five days a week, individual therapy twice weekly, a physician evaluation within seventy-two hours, and weekly physician visits.

77. When Plaintiffs claimed that this was a violation of MHPAEA, Moda made no attempt to justify these treatment limitations but instead asserted that because it applied treatment limitations on both medical and surgical and mental healthcare generally, it was not in violation of MHPAEA. This interpretation misapprehends MHPAEA's requirements.

78. In addition, the level of care applied by Moda failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

79. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

80. Further, V.S.'s wilderness treatment at Evoke was denied, in part, because Moda refused to accept the revenue code Evoke used to bill its services. The National

Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

81. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code for which Moda categorically excludes coverage.

82. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

83. The violations of MHPAEA by Moda are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plans and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plans to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plans as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

84. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.    Judgment in the total amount that is owed for V.S.'s medically necessary treatment at Evoke and Sunrise under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.    Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.    Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.    For such further relief as the Court deems just and proper.

DATED this 19th day of November, 2023.

By     s/ Brian S. King
           Brian S. King
           Attorney for Plaintiffs

County of Plaintiffs' Residence:
Multnomah County, Oregon